# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

KIMBERLY BELL, as Administratix of )
The Estate of David Lee Fish II, )
                                                )
      Plaintiff, )
v. )       No. 2:13-cv-0104
                                                )       Judge Sharp
CUMBERLAND COUNTY, TENNESEE, )
BUTCH BURGESS, Individually and in )
his Official Capacity as Sheriff of )
Cumberland County, TN, and )
JONATHAN HUMAN, Individually and )
as an employee of Cumberland County, )
TN, and as Deputy with the )
Cumberland County Sheriff's Dept., )
                                                )
      Defendants. )

## MEMORANDUM

Pending before the Court is Defendants' *Motion for Summary Judgment* (Docket Entry No. 28) to which Plaintiff filed a response (Docket Entry No. 39), and Defendants filed a reply (Docket Entry No. 41).[1]

## FACTS

On October 12, 2012, Cumberland County Deputy Sheriff Jonathan Human ("Deputy Human")[2] responded to a call from dispatch at the residence of Cynthia Franklin ("Franklin")

---

[1] Defendants filed a *Motion to Ascertain Status* (Docket Entry No. 42) on January 11, 2016. The motion will be denied as moot.

[2] Deputy Human was employed by Defendant, Cumberland County Sheriff's Department ("CCSD"). At all times material to this action, Defendant, Sheriff Butch Burgess ("Sheriff Burgess"), was the elected Sheriff for Cumberland County, Tennessee.

Deputy Human was hired in August 2010. He graduated from Cleveland State Law Enforcement Training Academy in 2008 and received POST certification. Prior to hiring Deputy Human, the CCSD Chief Investigator at the time, Casey Cox, conducted a background check and contacted the law enforcement agency where he was currently employed to check his references.

and Lysle Shields on Spooner Drive in Crossville, Tennessee.[3]  Franklin's ex-boyfriend, David Fish, II ("Fish"), had been knocking on their doors and windows and running away. Deputy Human located Fish at a nearby residence and informed him not to return to the Spooner Drive residence or he would be arrested for trespassing. Fish indicated that he understood and would not return.[4]

Two days later, on the afternoon of October 14, 2012, Deputy Human responded to a trespassing call at the same Spooner Drive residence.[5]  Deputy Human went to the garage door and spoke with Franklin who appeared visibly upset and had been crying.  Franklin told Deputy Human that she was okay and Fish was there getting some of his things.[6]  Franklin said she would call back if she needed the police again.

As Deputy Human was walking back towards his patrol car to leave, he observed Fish in the yard next to the woods.  (Human Dep. at p. 70).  According to Deputy Human, he started walking towards Fish and called for Fish to come talk to him, but he started running away, back towards the house.  Deputy Human lost sight of Fish, and could not find him anywhere outside the house.  (*Id*. at p. 74).  Deputy Human attempted to call for backup outside, but his radio would not work.  (*Id*. at p. 106).

---

[3]  Unless otherwise noted, the facts are drawn from the parties' statements of material facts and related declarations and exhibits.  Based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

[4] Although the police had been called to the Spooner Drive residence on prior occasions in response to domestic violence complaints against Fish, Deputy Human had no interactions with him prior to October 12, 2012.  However, it was common knowledge that Fish had previously hit Franklin, and they had been in domestic situations prior to this incident.  (Human Dep. at p. 67).

[5] According to the TBI investigation, it was Lysle Shields, who called Cumberland County 911, to report that Fish was trying to get into his house.  (Docket Entry No. 40-25 at 9, TBI Report CID-8).

[6] Franklin testified in her deposition that she responded in this manner because "she didn't want anyone else getting hurt."  (Franklin Dep. at p. 62).  Fish had come in through an unlocked door earlier that day, picked up an "X-Acto knife" and meat clever and told Franklin they "were both going to die that day." (*Id*. at 47).

According to Deputy Human, he went back to the garage door of the home, and Franklin opened the door and let him inside. (Human Dep. at p. 74).[7] Deputy Human asked where Fish was and Franklin pointed down the steps, directing Deputy Human to the basement.[8] Deputy Human told Franklin to stay upstairs, and he proceeded down the steps towards the basement. Deputy Human identified himself as law enforcement and drew his firearm halfway down the steps. (*Id*. at pp. 75-76, 103-104). The basement was dimly lit, filled with boxes of stuff, and lines of hanging clothes, and Fish was standing in the corner with his hands concealed. (*Id*. at p. 139). When ordered, Fish showed his hands and Deputy Human holstered his firearm. (*Id*. at pp. 139-140). At some point Franklin came down the stairs into the basement.

Deputy Human asked Fish to step outside to talk with him, and Fish became extremely angry and agitated and got into a fighting stance. (Human Dep. at p. 77). Deputy Human told Fish he did not want to fight, and just wanted to talk to him outside. (*Id*. at p. 141). Fish started coming towards Franklin. Deputy Human sprayed pepper spray towards Fish in an attempt to stop him. (*Id*. at pp. 80, 146). The pepper spray had no effect on Fish, and he lunged at Franklin. Deputy Human grabbed Fish's right arm to keep him from getting to Franklin. Fish then grabbed Deputy Human, and started driving him backwards, slamming Human into a pole. Fish ultimately took the pepper spray from Deputy Human and used it on him. (Franklin Dep. at p. 59). Fish violently attacked Deputy Human, repeatedly hitting him in the sides and the back of his head. Deputy Human and Fish ended up on the ground with Fish on top of Human, hitting Human and slamming his head into a pole. At some point, Deputy Human was able to get on top

---

[7]Plaintiff avers there is an inconsistency as to which door Deputy Human entered. Franklin's account is that Deputy Human entered through the kitchen door. (Franklin Dep. at p. 135).

[8] Plaintiff disputes whether Franklin actually gave Deputy Human verbal consent to enter her home. And Defendants do not disagree with this statement. In fact, Deputy Human testified in his deposition that he did not ask for consent. Rather, "Franklin opened the door and stepped back and let [him] in." These actions led him to believe he had her consent. *See* (Human Dep. at pp. 101-102).

of Fish.  Deputy Human tried to get up, but Fish kept pulling him down and hitting him in the sides and the back of the head.[9]  According to Human, he pulled out his baton to defend himself, but Fish knocked it away.  (Human Dep. at pp. 84-86).[10]

Fish got back on top of Deputy Human and had him pinned on the floor, straddling Human's chest.  Human was lying on his back, going in and out of consciousness with Fish sitting on top of him.  (Human Dep. at p. 150).  Fish grabbed an iron skillet and was attempting to strike Human with it.  Franklin unsuccessfully tried to get the skillet away and yelled for Fish to stop.  Deputy Human was in fear for his life, and Franklin was afraid that Fish was going to kill her and Deputy Human.  (Human Dep. at p. 94; Franklin Dep. at p. 141).

Deputy Human pushed Fish with his left hand, and managed to get out his gun.  Deputy Human's firearm was his last available weapon.  According to Deputy Human, he aimed his weapon the best he could and fired up towards Fish[11] until Fish stopped attacking him.[12] (Human Dep. at p. 151).  Fish stopped moving, and was lying across Deputy Human's legs.

---

[9] Although Plaintiff disputes the exact sequence of events, she does not dispute these events took place. *See* (Docket Entry No. 40 at ¶¶61-64).

[10] Plaintiff disputes this statement, claiming, "it is disputed Fish knocked the baton away from Deputy Human, as Deputy Human stated he does not know how he lost it."  (Docket Entry No. 40 at ¶66)(citing Human Dep. at pp. 85-86).  The Court has reviewed the cited deposition testimony.  Although Deputy Human does testify as Plaintiff stated, when analyzing the lines before and after the testimony, it is clear he is testifying that Fish, in fact, was the one who knocked the baton away – he just does not know how Fish managed to do it.  As such, Plaintiff's attempt to create a disputed material fact fails in this instance.

[11] This fact is disputed by Plaintiff because "[t]he TBI file shows that Deputy Human shot Fish three times in the back, one time in the back of the head, two times in the back of the neck, and one time on the back shoulder."  (Docket Entry No. 40 at ¶75)(citing TBI File, CID 162-165, 169).  However, the location of the gunshot wounds are not inconsistent with Deputy Human's testimony.  This does not establish a disputed genuine issue of material fact.

[12] CCSD has a written use of force continuum, wherein every officer receives training.  The basic outline for the CCSD use of force continuum is: 1) Officer Presence; 2) Verbal Commands; 3) Show of force limited hands on; 4) Chemical weapon; 5) Physical control; 6) Intermediate weapon; 7) Deadly force.

Deputy Human instructed Franklin to stay away from him and go get help. He immediately radioed for help following the encounter with Fish. (Franklin Dep. at p. 71). Fish was lying on top of Human, not moving. Human was also injured and incapacitated during the fight. Human was having trouble seeing, and was unable to get up until help arrived.

When backup arrived, Officer Butch LeFebrve moved Fish off Human and placed him in handcuffs. Fish was transported by EMS to Cumberland Medical Center and was pronounced dead on arrival. Deputy Human was transported by EMS to Cumberland Medical Center and treated for rib contusions and a concussion.

The Tennessee Bureau of Investigation ("TBI") responded to the scene and took control of the investigation. A TBI agent interviewed Deputy Human on October 16, 2012, and Deputy Human gave a voluntary statement. In a letter to former Sheriff Butch Burgess dated April 30, 2014, District Attorney General Randall York concluded, after reviewing the TBI investigation file, that Deputy Human acted in accordance with established principals and protocols of the Tennessee Law Enforcement Standards as related to this matter and requested that the TBI file be closed.[13] Based upon the investigation and conclusions of the TBI and the District Attorney General, no disciplinary action was taken against Deputy Human. (Burgess Aff., ¶20).

## ANALYSIS

On October 10, 2013, Plaintiff Kimberly Bell, as Administratrix of the estate of David Fish, II, brought this action against the Defendants, Cumberland County, Tennessee ("the County"), Butch Burgess, individually and in his official capacity as Sheriff of Cumberland County, and Jonathan Human, individually and in his official capacity as a Deputy Sheriff, for

---

[13] Deputy Human trained and qualified with the firearm he was carrying on October 14, 2012. He also successfully completed training and was certified to use the chemical weapon and ASP straight baton he was carrying on October 14, 2012.

alleged constitutional violations pursuant to 42 U.S.C. § 1983. Plaintiff claims that Deputy Human's use of deadly force was unreasonable and excessive, and inadequate medical care was rendered, in violation of the Fourth, Fifth, and Fourteenth Amendments. Plaintiff avers that the County failed to adequately train, hire and supervise its officers. Plaintiff also asserts a variety of state law claims, including assault, battery, and negligent and intentional infliction of emotional distress. Defendants have moved for summary judgment on the entirety of Plaintiff's claims.

## I.     Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    Federal Claims

### 1. Individual Liability Claims[14]

The federal claims, alleging violations of the Fourth, Fifth, and Fourteenth Amendments, are brought pursuant to 42 U.S.C. § 1983, which, so far as relevant, provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983. In order to state a claim under this statute, "a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." *Harbin-Bey v. Rutter*, 420 F.3d 571, 574 (6th Cir. 2005).

---

[14] Plaintiff acknowledges in her response to the motion for summary judgment that the claims brought against Sheriff Burgess and Deputy Human in their official capacities are "duplicitous and should be dismissed." (Docket Entry No. 39 at 5). Likewise, Plaintiff concedes that all claims brought against Sheriff Burgess in his individual capacity should be dismissed. Therefore, all claims brought against Deputy Human in his official capacity will be dismissed. Furthermore, all claims brought against Sheriff Burgess in his official and individual capacities will be dismissed.

### a. Fifth and Fourteenth Amendment Claims

In response to the motion for summary judgment, Plaintiff concedes that Defendants "are correct insofar as the claims brought against them under the Fifth Amendment should be dismissed." (Docket Entry No. 39 at 4). Accordingly, summary judgment will be granted on Plaintiff's Fifth Amendment claim.

As to the Fourteenth Amendment excessive force claim, the parties dispute whether Plaintiff's excessive force claim is properly analyzed solely under the Fourth Amendment, or under the Fourteenth Amendment as well. "This is not a purely academic question as the standards of liability vary significantly according to which amendment applies." *Lanman v. Hinson*, 529 F.3d 673, 679 (6th Cir. 2008). Plaintiff acknowledges that Defendants "correctly imply that excessive force claims brought pursuant to arrest should be analyzed under a Fourth Amendment standard." (*Id*.). However, Plaintiff claims that there was "no intent to arrest in this case," citing *County of Sacramento v. Lewis*.[15] (*Id*. at 4-5). Plaintiff continues,

> To find such a constitutional injury, however, the Court held that a Plaintiff must show that the police possess a purpose to cause harm, such that their actions were sufficiently arbitrary and reckless that they shock the conscience. Such is the case here. Deputy Human testified that Mr. Fish had not broken any laws and that, "I figured why not just go ahead and talk to him." (Deposition of Human Pp. 70-71). It follows that if Human were simply going to "talk to [Fish]", then no arrest was to be made. Indeed, there is a claim under the Fourteenth Amendment in this case, Deputy Hunan set out to talk with Mr. Fish and subsequently killed him. This shocks the conscience, and the Fourteenth Amendment claims should not be dismissed.

(Docket Entry No. 39 at 5). Defendants counter that Plaintiff fails to "set forth any disputed facts but submits that Deputy Human's actions 'shocks the conscience.'" Citing *Claybrook v.*

---

[15] 523 U.S. 833, 836 (1998).

*Birchwell*,[16] Defendants argue Plaintiff cannot "prove that Deputy Human maliciously or sadistically used forced against Fish rather than in good faith effort to restore discipline." (Docket Entry No. 41 at 3). Further, Defendants explain, "the undisputed proof is that Deputy Human used his firearm as a last resort, only after use of his pepper spray and baton failed to deter Fish during his violent attack. (*Id.*).

"Whenever an officer restrains the freedom of a person to walk away, he has seized that person" for purposes of the Fourth Amendment, and "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Accordingly, the Court analyzes Plaintiff's excessive force claim under the Fourth Amendment. Therefore, summary judgment will be granted on Plaintiff's Fourteenth Amendment claim as it relates to excessive force.

### b. Fourth Amendment Claim – Excessive Force

As indicated *supra*, Plaintiff brings a Fourth Amendment claim against Deputy Human for excessive force. In *Graham v. Connor*, the Supreme Court held "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" 490 U.S. 386, 395 (1989) (italics in original). The Court went on to hold that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact

---

[16] "In a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation [], public servants' reflexive actions shock the conscience only if they involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline[.]" 199 F.3d 350, 359 (6th Cir. 2000).

that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* In making the reasonableness calculation, *Graham* instructs courts to look at the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest. *Id.* The Sixth Circuit has further noted that *Graham's* admonition against using such bias "carries great weight" if "the events in question happened very quickly." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

"In determining whether there has been a violation of the Fourth Amendment, [a court] considers not the 'extent of the injury inflicted,' but whether an officer subjects a detainee to 'gratuitous violence.'" *Miller v. Sanilac County*, 606 F.3d 230, 252 (6th Cir. 2010)) (quoting *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)). The use of deadly force is justified when an officer has reason to believe that a suspect poses a threat of serious harm to the officer or others. *Garner*, 471 U.S. at 1. This is particularly true in the face of a rapidly evolving situation, where an officer reasonably believes "that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). In *Graham*, the Supreme Court cautioned courts against passing judgment on the police based on hindsight bias. *Graham,* 490 U.S. at 396.[17]

---

[17] The Court is aware that "deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness," and "the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Thus, while a "court may be hesitant to doubt [an officer's] testimony . . . 'the court may not simply accept what may be a self-serving account by the police officer," but "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Jefferson v. Lewis*, 595 F.3d 454, 462 (6th Cir. 2010) (citing *Scott*, 39 F.3d at 915). This includes looking at "contemporaneous statements by the officers" and considering "whether officer's story is internally consistent and consistent with other known facts.'" *Scott*, 39 F.3d at 915. Fortunately in the case at hand, Cynthia Franklin, a surviving witness, has provided the Court with valuable testimony in this case.

Plaintiff argues that summary judgment is inappropriate on her excessive force claims because Defendant Human's actions were not objectively reasonable. Plaintiff claims that Deputy Human was the aggressor – and not only pursued Fish without reason, he drew this weapon while Fish was in a basement corner. In addition, Plaintiff claims Fish never threatened Human, and he wrongly perceived Fish's fighting stance as a peril. *See* (Docket Entry No. 30 at 10-11).

In determining whether Fish posed a threat of serious harm, the focus is from the reasonable officers' perspective. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 405 (6th Cir. 2007). Simply put, "[t]he case law must 'dictate, that is, truly compel, the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" *Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012)(citations omitted). Even granting Plaintiff the lenience required by Rule 56, there simply is no competent evidence to create a jury question on whether Deputy Human's actions were objectively reasonable.

Applying the proper Fourth Amendment standard, it is clear that Deputy Human's conduct does not violate this Amendment. Even if the Fourteenth Amendment were applicable, Defendant's conduct would not rise to the level of a violation of that Amendment. It is undisputed that this was a rapidly evolving situation – and both Deputy Human and Cynthia Franklin testified that Fish posed serious physical harm and/or death to them. It is additionally undisputed that Fish refused to obey verbal commands; Fish became extremely agitated and came towards Franklin, forcing Deputy Human to use hands-on force and pepper spray; and ultimately began his rampage against Human – causing Human to fire his weapon until the attack ceased.

The record before the Court is undisputed that Defendant Human did not use any force beyond what was necessary to maintain control of a volatile situation. He acted with good-faith and in a good-faith effort, and acted within his training – using CCSD's written use of force continuum, and as a last resort used his firearm. Because there are no genuine issues of material fact as to whether a constitutional violation occurred, summary judgment should be granted as to Plaintiff's Fourth Amendment claim.

### c. Fourteenth Amendment Claim - Deliberate Indifference

In support of the deliberate indifference claim, Plaintiff contends that after the "struggle, Fish was lying in the basement bleeding [], and instead of rendering medical assistance, Mr. Fish was handcuffed []." (Docket Entry No. 39 at 13). Further, Plaintiff argues that a man who has a serious medical need, and "handcuffing the man instead of rendering medical attention is showing a deliberate indifference to that need." (*Id.*). In the instant case, Defendants do not dispute Fish has a sufficiently serious medical need. However, Defendants urge that Plaintiff cannot prove Fish's need for treatment was not addressed "within a reasonable time frame or that Human disregarded a substantial risk to Fish." (Docket Entry No. 30 at 14). Rather, Deputy Human immediately called for help and instructed Cynthia Franklin to do the same. Further, Human was incapacitated during the fight and was unable to get up until help arrived. (*Id.*).

The Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while apprehended by police. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). The standard used in assessing such a claim is the same for both arrestees and convicted inmates: deliberate indifference. *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008). "A deliberate indifference claim has both objective and subjective components."

*Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). "The objective component requires a plaintiff to show that 'the medical need at issue is sufficiently serious,' " while "[t]he subjective component requires a showing that 'prison officials have a sufficiently culpable state of mind in denying medical care.' " *Id.* (citations omitted).

The Due Process Clause requires responsible governments and their agents to secure medical care for persons who have been injured while in police custody.... Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1097 (6th Cir. 1992)(citing *Maddox v. City of Los Angeles,* 792 F.2d 1408 (9th Cir. 1986)).

Here, the undisputed evidence provides that the medical need at issue was indeed serious and Defendants do not argue otherwise – nonetheless, Plaintiff has failed to provide evidence that Deputy Human subjectively inferred a substantial risk of harm to Fish, and then intentionally disregarded it. Rather, the record shows that Defendant Human promptly summoned the necessary medical attention for Fish by radioing for help as well as instructing Franklin to seek aid. Accordingly, Defendants' motion will be granted with regard to the Fourteenth Amendment claim.[18]

### d. Qualified Immunity

Deputy Fish has invoked qualified immunity as a defense. The doctrine of qualified immunity provides federal and state employees "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). An

---

[18] As to Plaintiff's claim that "handcuffing the man instead of rendering medical attention is showing a deliberate indifference to that need," this appears to be an assertion and potential claim against Officer Butch LeFebrve (not Deputy Human), who was not even a named defendant in this case. Therefore, the Court need not discuss this point any further.

officer is entitled to qualified immunity if he was performing a discretionary function and his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The qualified immunity analysis has two prongs. Under the first prong, the court must determine whether the official violated a constitutional or statutory right. *Ashcroft v. al-Kidd,* — – U.S. ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). Under the second prong, the court determines whether the right violated was "clearly established" at the time of the violation. *Id.* The court may choose the order in which to analyze the two prongs. *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

As stated *supra*, Plaintiff has failed to show that a constitutional violation occurred. Accordingly, Defendant Human is entitled to qualified immunity, and Defendants' motion for summary judgment on the Section 1983 claim is GRANTED.

### 2. Municipal Liability Claims

Plaintiff claims that Fish was injured by the County's deficient hiring, training, and supervision. (Docket Entry No. 39 at 13-14).

In *Monell v. Department of Social Services.*, 436 U.S. 658, 691 (1978), the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Radavansky v. City of Olmstead Falls*, 395 F.3d 291, 311 (6th Cir. 2005) (quoting *Monell*, 436 U.S. at 694).

Plaintiff's municipal liability claim against the police department fails. Even assuming that this Court's decision about the liability of Deputy Human is incorrect, summary judgment on Plaintiff's municipal liability claims is appropriate because she has not established the necessary requirement of such a claim.

### a. Hiring

As to Plaintiff's allegations regarding hiring, the Supreme Court has recognized that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In other words, "it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff," and "[t]he connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Id.* at 412 (emphasis in original).

Plaintiff claims the "connection between the inadequate screening and the constitutional violation" committed by Deputy Human "is indeed strong." (Docket Entry No. 39 at 17). Furthermore, in spite of Sheriff Burgess having knowledge of the prior suit, he never sought the details. (*Id.*). Specifically, Plaintiff argues this background check was inadequately performed because no one inquired about Deputy Human's involvement in other lawsuits, as he was involved in an excessive force lawsuit at the time. (Docket Entry No. 40 at SOF No. 5). To provide light to this argument, the Court has located and reviewed the case at issue, and, as it turns out, that lawsuit was brought by the same Plaintiff's counsel as the pending case. The case

was ultimately terminated by a *Stipulation of Dismissal* by the parties and Order.  *See* (Case No. 2:11-cv-0010, Docket Entry Nos. 37 and 38).

A failure to screen applicants for law enforcement positions rises to the level of deliberate indifference "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right...." *Bryan Cnty.*, 520 U.S. at 411, 117 S.Ct. 1382. It is insufficient for Plaintiffs to rely "on the mere probability that any officer inadequately screened will inflict any constitutional injury." *Id.* at 412, 117 S.Ct. 1382.

The Court finds that Plaintiff has presented insufficient evidence of Cumberland County disregarding a known or obvious risk of injury in the hiring of Deputy Human.  Absent strong evidence of a connection between the background of the officers and the alleged constitutional violations, Plaintiff cannot prevail on her hiring claim under § 1983.  Accordingly, summary judgment will be granted on this claim.

### b. Training and Supervision

Inadequate supervision and training will give rise to municipal liability, "[i]n limited circumstances, [where] a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights ... rise[s] to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).  The legal standards for a claim of inadequate supervision and one of inadequate training are essentially the same. *See Okolo v. Metro. Gov. of Nashville*, 892 F.Supp.2d 931, 943 (M.D.Tenn. 2012) ("Liability for unconstitutionally inadequate supervision or discipline is treated, for all intents and purposes, as a failure to train.")

As it relates to their claim of inadequate training and supervision, Plaintiff claims "it is painfully obvious" that Deputy Human has not been adequately trained – in spite that Fish had "broken no law," Deputy Human "insisted on pursuing [him], even back into the house and into the basement." (Docket Entry No. 39 at 16). And as to supervision, Plaintiff claims "officers are allowed to break policy without discipline." (*Id*.). She points specifically to deposition testimony, wherein Deputy Human testified he had not filled out report specifying he used his weapon the day of the incident. (*Id*.). However, when the record is reviewed further, it is clear that the Sheriff's Department turned the investigation over to the TBI, and they are wholly aware a weapon was discharged.

Even though "[t]he courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability," *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006), "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick*, 131 S.Ct. at 1359. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff willbe able to point to something the city 'could have done' to prevent the unfortunate incident." *Id*. at 392. Therefore, and because any "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," *id*. at 391, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 131 U.S. at 1359 (citation omitted). "To establish deliberate indifference, the plaintiff

'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the *training in this particular area was deficient and likely to cause injury*.'" *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (emphasis added). Plaintiff simply has not carried that burden. Therefore, Defendants' motion will be granted with respect to the municipal liability claim.

## III. State Law Claims

Plaintiff brings state law claims for assault and battery, and negligent, and the intentional infliction of emotional distress against Deputy Human, and further alleges that Cumberland County is liable for these claims, to the extent that it has not waived immunity under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 *et seq.* Plaintiffs also "refer the Court to T.C.A. § 8-8-301 and § 8-8-302." (Complaint, Docket No. 1 at 17).

While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state-law claims under the circumstances presented by this case, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 900 (6th Cir. 2001); *see, e.g., Jackson v. Town of Caryville, Tenn.,* Nos. 3:10–CV–153, 3:10–CV–240, 2011 WL 5143057, at *10 (E.D.Tenn. Oct. 28, 2011). Having found the federal claims should be dismissed on Defendants' motion for summary judgment, pursuant to §1367(c), and in the exercise of its discretion and in the interests of comity, the Court will decline to exercise continuing pendent or supplemental jurisdiction over plaintiff's state-law claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## CONCLUSION

For all of the reasons stated, Defendants' *Motion for Summary Judgment* (Docket Entry No. 28) will be granted as to Plaintiff's federal claims and this case will be dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and those claims will be dismissed without prejudice. Furthermore, the pending *Motion to Ascertain Status* (Docket Entry No. 42) will be denied as moot.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE